NEW LENOX INDUSTRIES, INC., a Florida
corporation,

        Plaintiff,

vs.

CHARLES H. FENTON, an individual, and

AIRBELT SYSTEMS, LLC.

        Defendants.

_____/

CASE NO.: O6-934-CAB

DIVISION:

## COMPLAINT

The Plaintiff, NEW LENOX INDUSTRIES, INC., a Florida corporation ("NLI") sues the

Defendants, CHARLES H. FENTON ("Fenton") and AIRBELT SYSTEMS, LLC, a California

limited liability company, ("AirBelt"), (hereinafter collectively referred to as "Defendants") and

alleges as follows:

1.    This is an action for damages in excess of $15,000.00 in amount and for

injunctive relief.

2.    The Plaintiff, NLI, is a corporation organized and existing under the laws of the

state of Florida with its principle place of business in Marion County, Florida. NLI is the

developer and owner of technology which inflates airbags used in vehicles.

3.    In 1994, NLI was working with Reeves Brothers, Inc. to obtain airbags for use in

the NLI airbag system. Reeves was considering purchasing stock in NLI and retained the

defendant, Fenton, as an airbag industry consultant to evaluate and audit NLI's airbag

technology. Fenton previously had served as a Vice President of Morton International, Inc.,

which was the world's leading manufacturer of airbags for the automotive industry, and his opinion regarding airbag technology carried weight in the industry.

4.     NLI's airbag technology was highly confidential at that time and NLI would not disclose its technology to Fenton unless Fenton entered into a confidentiality agreement with NLI.

5.     On or about January 24, 1995, Fenton entered into a confidentiality agreement with NLI in Marion County, Florida whereby he agreed not to use or disclose NLI's confidential information. A true and correct copy of the confidentiality agreement is attached as Exhibit "A" to this Complaint and is hereinafter referred to as the "Confidentiality Agreement". Immediately after Fenton signed the Confidentiality Agreement, NLI disclosed its confidential and proprietary airbag technology to Fenton and demonstrated its operation to Fenton. At the time of this disclosure, NLI's confidential and proprietary airbag inflation technology was not known in the airbag or automotive industries and no one held or had applied for a patent which covered the airbag inflation technology developed by NLI and disclosed by NLI to Fenton.

6.     On January 31, 1995, after reviewing NLI's confidential documents regarding its airbag technology and seeing NLI's airbag technology demonstrated, Fenton wrote a letter to NLI stating that NLI's cold gas air bag system needed 24 to 30 months of development before it was ready for market introduction and that cold gas air bag inflation technology represents the foundation for the next generation of automotive airbag products. Upon information and belief, Fenton gave Reeves a negative report regarding NLI's airbag technology. Reeves did not purchase any stock from NLI or otherwise invest in NLI.

2

7. Contrary to Fenton's reports, Fenton believed that NLI's cold gas airbag inflation technology was a quantum improvement over existing airbag inflator technologies and that it was a breakthrough in airbag inflator technology.

8. Upon information and belief, Fenton had been attempting to develop a cold gas airbag inflation system before NLI disclosed its airbag inflation system to Fenton. Fenton fraudulently concealed this information from NLI and NLI did not know that it was disclosing its confidential and proprietary cold gas inflation system to a competitor.

9. Prior to cold gas airbag inflation, airbags were inflated using hot gas near 1,000 degrees Fahrenheit. Hot gas airbag inflation caused injury to vehicle occupants, burning them upon inflation of the airbag, and as a result the federal government mandated that the automotive industry develop a safer alternative technology to deploy air bags in vehicles by 1998. Companies in the 1990's were attempting at great expense to develop a cold gas airbag inflation system but could not develop a mechanism to cause the canister holding the cold gas under pressure to open and deploy the pressurized gas in the milliseconds required to timely fill the airbag. NLI invented the mechanism that solved this problem, thereby making cold gas airbag inflation an efficacious airbag inflation system and satisfying the federal government's mandate for a safer alternative to hot gas inflation systems.

10. NLI's airbag inflation system used a manifold, with a helium filled high-pressure vessel that included a scored diaphragm and micro-detonator. Until NLI developed this system, there had never been a micro-detonator used for this purpose. NLI disclosed to Fenton, among other things, the technical data from the manufacturers of the components used in the NLI airbag inflator, the data on the assembly and placement of these parts with respect to each other, such as the spacing of the initiator away from the diaphragm. NLI also disclosed its plans to down size

3

the initiator to a less explosive charge and to use a shaped metal cup to hold the initiator for proper spacing away from the diaphragm to produce an enhanced directional shock wave or pulse.

11. On or about February 12, 1995, the CEO and president of NLI, F. Michael Barnes, wrote to Fenton emphasizing again that the material and information disclosed to him was very confidential and proprietary information and the property of NLI and not to be discussed by Fenton with anyone.

12. At some time after NLI's disclosure of its cold gas airbag inflation technology to Fenton, Fenton both utilized and disclosed to third parties NLI's confidential and proprietary cold gas airbag inflation mechanism, thereby misappropriating NLI's proprietary and confidential cold gas airbag technology and converting it to his own use. Fenton, acting with others to whom he made such disclosure, then developed a cold gas airbag inflation system which incorporated NLI's proprietary and confidential airbag inflation technology. In October, 1995, Fenton created the defendant, AirBelt, a closely held limited liability company controlled by Fenton, to market and license intellectual property rights based upon the technology stolen from NLI. AirBelt is the alter ego of Fenton, having been created by Fenton to further and facilitate his misappropriation and theft of NLI's intellectual property and to fraudulently obtain licenses to technology based upon NLI's airbag inflation technology. At all relevant times Fenton was a managing member of AirBelt who controlled AirBelt's major decisions. AirBelt did not make important decisions independently of Fenton and failed to observe company formalities.

13. Upon information and belief, Fenton, acting through AirBelt, has licensed the NLI confidential and proprietary cold gas airbag inflation system to others, including a license to

4

TRW, Inc. whereby Fenton and/or AirBelt have received royalties and/or other compensation in the tens of millions of dollars.

14. The Defendants have conducted and engaged in business in the state of Florida directly related to their misappropriation and theft of NLI's intellectual property.

15. The Defendants have used and disclosed, and continue to use and disclose, NLI's confidential and proprietary information and technology. The Defendants' misappropriation and theft of NLI's intellectual property in its cold gas airbag inflation system has caused and continues to cause injury to NLI in the state of Florida.

16. This court has personal jurisdiction over the Defendants pursuant to § 48.193 (1) (a), (b) and (g) Florida Statutes because the Defendants have conducted and engaged in business in this state, have committed a tort within this state, and have breached contractual duties to NLI in this state. Upon information and belief, the Defendants also have regularly and systematically engaged in business in the state of Florida in connection with the technology which they stole from NLI. This court also has personal jurisdiction over the Defendants pursuant to § 48.193 (2) Florida Statutes.

17. All conditions precedent to this action have been performed, have occurred or have been waived.

18. NLI has retained the undersigned counsel and agreed to pay them a reasonable fee for their services.

## COUNT I
## BREACH OF CONFIDENTIAL AGREEMENT

19. Plaintiff incorporates by reference paragraphs 1-18 above as if fully set forth herein.

5

20. Fenton has breached the Confidentiality Agreement by using and disclosing and continuing to use and disclose, confidential information of NLI including NLI's cold gas airbag inflator system.

21. As a direct and proximate result of Fenton's breach of the Confidentiality Agreement, NLI has been damaged in an amount exceeding $15,000.00

WHEREFORE, NLI demands a judgment in its favor and against Fenton for money damages in excess of $15,000.00 in amount, costs and all other and further relief that this court deems just.

## COUNT II
## FRAUD

22. Plaintiff incorporates by reference paragraphs 1-21 above as if fully set forth herein.

23. At the time Fenton entered into the Confidentiality Agreement Fenton was attempting to develop his own cold gas airbag inflator system.

24. At the time Fenton entered into the Confidentiality Agreement, Michael Barnes discussed with Fenton that NLI's cold gas airbag inflator system was highly confidential and could not be disclosed to or used by anyone in competition with NLI in the design and development of cold gas airbag inflator systems. Fenton represented to Barnes that he would not make such a disclosure or use of this information, when Fenton knew that he was in competition with NLI in the design and development of cold gas airbag inflator systems. This was a material representation by Fenton to NLI in that NLI would not have disclosed its confidential information to Fenton if he had not made such representation. Moreover, Fenton's fraudulent concealment of the fact that he was in competition with NLI was material because NLI would not have disclosed its confidential information to a competitor. When Fenton signed the

6

Confidentiality Agreement, Fenton had no intention of performing his promise not to use or disclose NLI's confidential and proprietary cold gas airbag inflator system.

25.    In justifiable reliance upon Fenton's false representations and promises and fraudulent concealment, NLI disclosed its confidential information to Fenton.

26.    Fenton gave negative reports about NLI's cold gas airbag inflation technology when Fenton knew and believed that such technology was a breakthrough in cold gas airbag inflation technology and was a quantum improvement in such technology to discourage NLI's further use, development and exploitation of the NLI technology while Fenton intended to use and exploit NLI's technology for his own purposes and benefit.

27.    As a direct and proximate result of Fenton's fraudulent representations, promises and fraudulent concealment, NLI has been damaged in an amount exceeding $15,000.00.

WHEREFORE, NLI demands a judgment in its favor and against Fenton for damages in excess of $15,000.00 in amount, costs and all other relief which this court deems just.

## COUNT III
## MISAPPROPRIATION OF TRADE SECRETS

28.    Plaintiff incorporates by reference paragraphs 1-27 above as if fully set forth herein.

29.    NLI's airbag system, including its mechanism and method of inflating an airbag was at all relevant times a trade secret of NLI within the meaning of § 688.002 Florida Statutes. Hereinafter NLI's system of inflating an airbag is referred to as the "NLI trade secret". The NLI trade secret derived independent economic value from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use, and was the subject of efforts that were reasonable under the circumstances to maintain its secrecy. Such efforts included requiring all persons who had

7

access to the NLI trade secret to sign a confidentiality agreement with NLI agreeing not to disclose or use the NLI trade secret, keeping the NLI trade secret information including all drawings, specifications, and prototypes in a locked secure location accessible only by employees of NLI with a need for access to such information and devices, marking the NLI trade secret information as confidential and proprietary, and guarding the NLI trade secret information and devices with an armed security guard on the premises of NLI.

30.    Fenton acquired the NLI trade secret by improper means as described above.

31.    AirBelt acquired the NLI trade secret from Fenton knowing or having reason to know that it was acquired by Fenton by improper means.

32.    Fenton and AirBelt disclosed the NLI trade secret to others, including TRW, Inc.

33.    The Defendants have used and disclosed and continue to use and disclose, the NLI trade secret without the express or implied consent of NLI and have willfully and maliciously misappropriated the NLI trade secret.

34.    When AirBelt used and disclosed the NLI trade secret, AirBelt knew or had reason to know that Fenton had acquired the trade secret under circumstances giving rise to a duty to maintain its secrecy or limit its use or that Fenton owed a duty to NLI to maintain its secrecy or limit its use.

35.    As a direct and proximate result of the Defendants' misappropriation of the NLI trade secret, NLI has been damaged in an amount exceeding $15,000.00.

WHEREFORE, NLI demands judgment in its favor and against the Defendants for damages in an amount in excess of $15,000.00, costs, attorneys fees pursuant to § 688.005 Florida Statutes, an accounting and all other relief which this court deems just. NLI further demands preliminary and permanent injunctive relief, enjoining the Defendants and all persons

8

acting in concert with the Defendants or either of them from any further use or disclosure of the NLI trade secret.

## COUNT IV
## CIVIL THEFT

36. Plaintiff incorporates by reference paragraphs 28-34 above as if fully set forth herein.

37. The Defendants, with criminal intent, knowingly obtained or used, or endeavored to obtain or use, the NLI trade secret with the intent to temporarily or permanently deprive NLI of the right to such property or the benefits of such property or appropriated such property to their own use or the use of other persons or entities not entitled to the use of the property.

38. NLI has demanded in writing that the Defendants pay to NLI three (3) times its damages arising from the Defendants' theft.

WHEREFORE, NLI demands judgment in its favor and against the Defendants for damages in an amount in excess of $15,000.00, treble damages, attorneys fees pursuant to § 772.11 Florida Statutes, costs and all other relief which this court deems just.

## COUNT V
## UNJUST ENRICHMENT

39. Plaintiff incorporates by reference paragraphs 1-34 above as if fully set forth herein.

40. Plaintiff has conferred a benefit on AirBelt in that AirBelt has obtained NLI's confidential and proprietary trade secret information and used it to obtain license fees or royalties on technology based upon such NLI information.

41. AirBelt has knowledge of this benefit.

42. AirBelt voluntarily accepted and retained the benefit conferred.

9

43.     The circumstances are such that it would be inequitable for AirBelt to retain the benefit without paying the value thereof to NLI.

WHEREFORE, NLI demands judgment in its favor and against AirBelt for damages in an amount in excess of $15,000.00, costs and all other relief which this court deems just

## COUNT VI
## ASSIGNMENT OF PATENTS

44.     Plaintiff realleges the allegations of paragraphs 1-34 above as if fully set forth herein.

45.     To the extent the Defendants or their assignees have obtained any patents of any inventions based upon the NLI trade secret or any other confidential information of NLI furnished to Fenton pursuant to the Confidentiality Agreement and the Defendants or their assignees failed to disclose NLI or its employees as inventors or co-inventors, such patents have been fraudulently obtained and are held by the Defendants or their assignees in constructive trust for NLI.

WHEREFORE, NLI demands judgment in its favor and against the Defendants assigning to NLI all rights to patents and patent applications of the Defendants based upon the NLI trade secret or other confidential information of NLI disclosed to Fenton by NLI pursuant to the Confidentiality Agreement.

## JURY TRIAL DEMAND

NLI demands a trial by jury on all claims so triable.

10

Dated: April 28, 2006

_G. Donovan Conwell, Jr._
G. Donovan Conwell, Jr.
Florida Bar Number 371319
G. Wrede Kirkpatrick
Florida Bar Number 984116
Suzanne R. Eschrich
Florida Bar Number 0166626
CONWELL, SUKHIA & KIRKPATRICK, P.A.
2701 N. Rocky Point Circle, Suite 1040
Tampa, Florida 33607
(813) 282-8000
(813) 282-8800 (facsimile)
Counsel for Plaintiff

11

# EXHIBIT A

# CONFIDENTIAL INFORMATION AND
## NON-DISCLOSURE AGREEMENT

AGREEMENT made and entered into as of the 24th day of January 1995.

BETWEEN:

NEW LENOX INDUSTRIES, INC., having an office at 20359 East Pennsylvania Avenue, Suite E, Dunnellon, Florida   34432.

AND:

CFA MANAGEMENT CONSULTING, having its principal office at, 1672 Shadow Valley Drive, Ogden, Utah  84403.

WHEREAS, there are business relationships between each party; and

WHEREAS, the proper conduct of such business relationships may require the disclosure of confidential and proprietary information between each party; and

WHEREAS, each party has agreed, subject to the terms and conditions of this Agreement, that it will maintain as confidential all such Confidential Information as may be disclosed during the term of this Agreement to it by the other.

NOW, THEREFORE, in consideration of the mutual covenants and agreements herein contained, the parties hereto agree as follows:

1. Each party agrees that it will not use, other than for the purpose of the business relationship, or reveal or make known to any person, firm or corporation, other than such party's employees with a need to know, any confidential information disclosed to it by the other. Confidential Information may include, but is not necessarily limited to information which relates to the business plan, product research and development plans, Client relationships supplier relationships, project or sales opportunities, proposal or bid strategies, or corporate strategies, all information which is to be treated as "Confidential" shall be marked "Confidential" by the disclosing party, or if orally disclosed identified as confidential at the time of disclosure and reduced to written memorandum within (30) days of the disclosure (collectively "Confidential Information"). Each party agrees to use at least the same degree of care to avoid disclosure or dissemination of the other party's confidential information as it uses to protect its own confidential information, but in no event less than a reasonable degree of care.

2.   Immediately upon termination of the business relationship between the parties, whatever may be the reason for such termination or on demand, the receiving party shall return upon written request to the other all written and Confidential Information of the other party in its possession.

3.   All Confidential Information received by one party from the other party shall be maintained in confidence and neither used by the receiving party nor disclosed to a third party by the receiving party for a period of three (3) years from the date of disclosure. Notwithstanding the foregoing, the party receiving Confidential Information shall have no obligation to the other party with respect to Confidential Information:

(a).   that is now publicly available,

(b).   that subsequently becomes publicly available, but only after it has become publicly available,

(c).   which the receiving party obtains from some third party not under any obligation to the disclosing party respecting such information, but only after the receiving party obtains such information,

(d).   which the receiving party at the time of disclosure by the disclosing party already has in its possession as evidenced by written records.

4.   This Agreement shall be binding upon and shall enure to the benefit of the parties hereto and their successors and assigns. Notwithstanding anything contained herein this Agreement may not be assigned without the prior written consent of the other party except for the assignment to the successor-in-interest of the entire business interest of the assignee.

5.   In the event that it is determined in any legal proceedings before a competent tribunal, that any paragraph, or a part of any paragraph of this Agreement is invalid, illegal or unenforceable, such paragraph or part thereof shall be deemed to be severed from this Agreement and the remainder of this Agreement shall continue in full force and effect.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement:

NEW LENOX INDUSTRIES, INC.

BY:

NAME: F.MICHAEL BARNES

TITLE: Chairman, CEO

DATE: _1-24-95_

CFA MANAGEMENT CONSULTING

BY

NAME:   CHUCK FENTON

TITLE: President

DATE: _1/24/95_